

**SO ORDERED.**

**SIGNED this 27 day of January, 2010.**

Catharine R. Carruthers
United States Bankruptcy Judge

---

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NORTH CAROLINA
WILMINGTON DIVISION

| | |
|---|---|
| In re:<br><br>Courtney B. Williams and<br>Deena L. Williams<br><br>    Debtors. | Case No. 08-02284 |
| James B. Angell, Trustee<br><br>    Plaintiff,<br>vs.<br><br>Courtney B. Williams and<br>Deena L. Williams,<br><br>    Defendants. | Adversary Proceeding No.<br>08-00188 |

### MEMORANDUM OPINION

This adversary proceeding came on before the court for trial in Wilmington, North Carolina on October 26 and 27, 2009 on the Trustee's Amended Complaint asserting claims against the Debtors pursuant to 11 U.S.C. § 727(a)(2), (a)(3), (a)(4)(A), (a)(4)(D), and (a)(5). After considering the pleadings, evidence, and arguments of counsel, this court makes the following findings of fact and conclusions of law pursuant to Rule 7052 of the Federal Rules of

Bankruptcy Procedure:

## PROCEDURAL BACKGROUND AND JURISDICTION

The Debtors filed a voluntary petition under Chapter 7 of the United States Bankruptcy Code on April 3, 2008 (the "Petition Date"), and James B. Angell was appointed as Chapter 7 Trustee (the "Trustee"). The Debtors's § 341 meeting was conducted on May 19, 2008. On September 16, 2008, the Trustee filed a Complaint objecting to the Debtors's discharge pursuant to 11 U.S.C. § 727(a)(2), (a)(3), (a)(4)(A), (a)(4)(D), and (a)(5). The Debtors responded with an answer filed on October 21, 2008. The Trustee filed an Amended Complaint on September 9, 2009 to amend and supplement certain factual allegations, and the Debtors filed an amended answer on October 5, 2009. This court has jurisdiction over the subject matter of this proceeding pursuant to 28 U.S.C. §§ 1334 and 157(a). This is a core proceeding under 28 U.S.C. § 157(b)(2) which this court may hear and determine.

## FINDINGS OF FACT

Prior to the Petition Date, the Debtors were involved in the business of buying, constructing, and selling real estate in North Carolina. In furtherance of this business, in June 2003 the Debtors formed Capital Improvements of North Carolina, LLC ("Capital Improvements"), a construction company in which they held a 100% ownership interest. Mr. Williams was licensed as a general contractor in 2006. Some of the Debtors's real estate transactions involve both Mr. Williams's mother, Marion Williams, and Mrs. Williams's mother, Mrs. Lorey.

Mr. Williams works as a mortgage broker and has been employed by Wells Fargo in that capacity for more than 10 years. Mr. Williams manages all of the household finances and

managed all of the finances for Capital Improvements when it was in operation. He has been diagnosed with adult attention deficit disorder, a condition which both Debtors testified renders him easily distracted, disorganized, and forgetful. Notwithstanding, Mrs. William relies on Mr. Williams regarding all financial matters and testified that she only writes checks or withdraws money at Mr. Williams's direction. Mrs. Williams does not maintain any financial records. Mr. Williams keeps track of the household finances in his head and accesses their bank accounts online to view the last 90 days of transactions. Any financial documents that the Debtors have are disorganized and scattered throughout their home and vehicles. At times, the Debtors do not even open mail that contains statements or other financial documents. Prior to filing, Mrs. Williams relied on Mr. Williams to provide the information for their bankruptcy schedules. She did not verify any of the information on the petition herself, though the evidence reflects that she had knowledge of certain financial matters related to their real property, life insurance policies, and various prepetition payments.

Mrs. Williams has a bachelor's degree in biology but has not been employed since 2001. Mrs. Williams testified that she could not presently work outside the home because she needed to be available to deal with the bankruptcy proceeding. The Debtors have two minor sons, ages five and ten. Their oldest son suffers from attention deficit hyperactivity disorder and dyslexia. Mrs. Williams's mother, Mrs. Lorey attends to the children after-school. Marion Williams, who suffers from dementia, also resides with the Debtors. She receives her own in-home assistance every day. Mr. Williams handles his mother's finances. Marion Williams purchased a home in 2005 on Live Oak Drive, Oak Island, North Carolina. In August 2007, Mrs. Lorey, moved to Oak Island. Mrs. Lorey rented Marion Williams's house on Live Oak Drive for $1,900.00 per

month while her own home was being constructed. Both Debtors testified that Mrs. Lorey paid rent by check to Mrs. Williams or cash directly to Marion Williams, and then Mr. Williams used these funds for his mother's mortgage payment. Mrs. Lorey moved out of Marion Williams home in August 2008. The house was the subject of foreclosure proceedings during the time the Mrs. Lorey was renting it. These proceedings were completed in August 2008.[1]

**The Petition and Schedules**

On the petition, the Mr. Williams listed his commission-based income from his employment with Wells Fargo in the amount of $11,884.13 per month, noting that his income fluctuates monthly. He also listed rental income in the amount of $1,800.00 per month. Mrs. Williams listed no income. Mr. Williams did not identify any amount of commission-based income earned but not yet received on Schedule B, Schedule I, or the Statement of Financial Affairs.

On Schedule A, the Debtors listed real property with a total value of $3,916,500.00, all owned as tenants by the entireties, including: (1) 108 Sellers Street, Oak Island, NC (the "Sellers Street Property"); (2) 807 Village Circle, Raleigh, NC (the "Raleigh Condominium"); (3) a 99% interest in 4901 East Beach Drive, Oak Island, NC (the "Beach Drive Property"); (4) 223 Norton Street, Oak Island, NC; (5) 216 Barbee Avenue, Oak Island, NC; and (6) 214 Barbee Avenue, Oak Island, NC. On the Petition Date, the Debtors expressed their intention to and surrendered their interest in the latter four individually owned and mortgaged investment properties. They

---

[1] The court finds the Debtors's testimony on this subject is not credible and is relevant for the purpose of illustrating the Debtors's general lack of credibility regarding their financial affairs. Marian Williams is homebound, requires daily care, and suffered from dementia. Yet, despite this testimony that rent was paid and mortgages payments were made, the property was in foreclosure.

indicated their intention to retain the Sellers Street Property as well as the Raleigh Condominium. The Debtors each claimed their homestead exemption in the Sellers Street Property, which was their residence on the Petition Date.

On Schedule D, the Debtors listed the following liens on the Sellers Street Property: (1) a first deed of trust in favor of Wells Fargo securing a debt in the amount of $652,843.75 (2) a second deed of trust in favor of State Employees Credit Union securing a debt in the amount of $388,000.00; and (3) a third deed of trust in favor of Mrs. Lorey securing a debt in the amount of $100,000.00 (the "Lorey Loan"). The Debtors obtained the Lorey Loan for $100,000.00 on December 21, 2007, approximately three and a half months prior to the Petition Date.[2] The Debtors listed a total of $3,817,742.07 in secured claims. The Debtors listed unsecured claims in the amount of $1,331,127.80. The Debtors listed no priority unsecured claims.

On Schedule G, the Debtors disclosed that the Beach Drive Property was subject to a contract for sale to Mrs. Lorey. The history of the Beach Drive Property is convoluted, at best, and relevant as an example of the complexity of the Debtors's prepetition transactions. The Debtors became owners of the Beach Drive Property on Oak Island on or around August 13, 2003, the date upon which the Debtors executed a deed of trust in favor of Branch Banking & Trust Company. On June 21, 2004, the Debtors transferred the Beach Drive Property to Capital Improvements. Then, on July 9, 2004, Marion Williams purchased the Beach Drive Property

---

[2] The Trustee discovered a defect in the first deed of trust held by Wells Fargo on the Sellers Street Property and brought an action to avoid it. The court entered judgment in the Trustee's favor, finding the Wells Fargo deed of trust void on the basis that it was only executed by Mr. Williams and therefore did not encumber entireties property. The Debtors remained in the Sellers Street Property, rent-free, until they moved out in early April 2009 and moved to their current residence located at 2907 East Yacht Drive, Oak Island, NC. Mrs. Lorey owns the property on Yacht Drive, for which the Debtors pay rent in the amount of $2,000.00 per month.

from Capital Improvements. Marion Williams executed a note in the amount of $333,200.00 and deed of trust in favor of Countrywide Home Loans, Inc. ("Countrywide") to finance this purchase. On September 14, 2004, Marion Williams transferred a 99% interest in the Beach Drive Property to the Debtors by general warranty deed. Three days later, the Debtors borrowed $100,000.00 from Security Savings Bank using the Beach Drive Property as collateral.[3] Thus, on the Petition Date, the Debtors owned a 99% interest in the Beach Drive Property, Marion Williams owned the remaining 1% interest, and the property was encumbered by mortgages in favor of Countrywide and Security Savings Bank.[4]

The Debtors listed personal property on Schedule B with a total value of $279,895.55. The only stock and/or interest in incorporated and unincorporated businesses that the Debtors listed was a 100% interest in Capital Improvements. The Debtors listed two accounts receivables consisting of rental accounts in the amount of $6,000.00, with the notation that the accounts were believed to be uncollectible as the tenant had filed a bankruptcy petition. As a result, the Debtors valued their interest in these accounts receivable to be $0.00. They listed two bank accounts at Cape Fear Bank: (1) a joint checking account ("Cape Fear Account #5788") with a Petition Date value of $913.29 based upon a balance of $7,706.33 less $6,793.00 in

---

[3] On Schedule A of their petition, the Debtors listed a 99% interest in the Beach Drive Property. Mr. Williams testified that he and Mrs. Williams intended to obtain only a 1% interest in the Beach Drive Property, leaving his mother with a 99% interest and that the documents transferring the interest were erroneous. He further testified that he was not even aware that he owned a 99% interest in the Beach Drive Property until he was informed of such by the Trustee. The court finds that Mr. Williams testimony regarding this matter is not credible.

[4] On March 18, 2008, the Debtors entered into a contract for the sale of the Beach Drive Property to Mrs. Lorey for $467,500.00, an amount sufficient to satisfy all of the property's lienholders in full. The sale did not close prior to the Petition Date, and Trustee rejected this contract.

outstanding checks, and (2) a joint money market account ("Cape Fear Account #5796") with a Petition Date balance of $15,094.53.

**Misstatements and Omissions on the Petition and Schedules A - J**

The Debtors made multiple false statements and omissions on their bankruptcy petition and schedules including, but not limited to, the following:

- As of the Petition Date, Mr. Williams was entitled to $24,242.30 in earned commissions he had not yet received from Wells Fargo. This income was not disclosed.

- Rather than a Petition Date balance of $15,094.53 as listed, according to bank records the balance on the Petition Date for Cape Fear Account #5796 was actually $28,383.33.

- The Debtors failed to disclose the following Northwestern Mutual insurance policies on Schedule B: a term policy with the female debtor as the beneficiary, a policy insuring the life of one of the Debtors's children with a cash value of $1,378.76, a short term disability policy, and a whole life policy with the male debtor as the beneficiary and a cash value of $5,789.17.

- The Debtors did not disclose on their schedules that they were parties to a property management contract with Margaret Rudd & Associates ("Margaret Rudd").

On August 21, 2008, the Debtors amended their schedules to reflect the correct petition date income and bank balances.

**The Statement of Financial Affairs**

The Debtors's Statement of Financial Affairs is lengthy and detailed. For example, it includes a list of more than twenty lawsuits and administrative proceedings, executions, garnishments, and attachment proceedings to which the Debtors were parties within one year

immediately preceding the Petition Date. The Debtors also listed a myriad of transfers made in their ordinary course of the business or financial affairs within two years of the Petition Date, including stock sales in excess of $100,000.00 and the transfer of a deed of trust in favor of Mrs. Williams's mother, Mrs. Lorey, in exchange for a $100,000.00 loan. The Statement of Financial Affairs indicates that the Debtors paid their attorney, whom they had retained as bankruptcy counsel on December 5, 2007, a total of $21,833.54 for prepetition legal services, "extraordinary" pre-bankruptcy planning, and preparation of the bankruptcy petition.

Despite the apparent detail, the Debtors's Statement of Financial Affairs contains numerous errors and omissions. The Debtors listed only $800.00 in rental income for all of 2008 despite the fact that they listed rental income in the amount of $1,800.00 per month on Schedule I, with a filing date of April 3, 2008. The Debtors did not disclose that on the day preceding the Petition Date, a bank account held jointly by Mr. Williams and Marion Williams was transferred so that it was held individually by Marion Williams. The Debtors sold SCANA stock on July 12, 2007, received $20,2093.17, and used a portion of these funds to satisfy some of the indebtedness of Capital Improvements. The sale of SCANA stock was not disclosed on the Debtors's Statement of Financial Affairs. The Debtors did not disclose payments to creditors for the benefit of Marion Williams and Mrs. Lorey made within one year prior to filing.

Furthermore, in answer to the Statement of Financial Affairs question 3(c) regarding payments made within one year to or for the benefit of creditors who were insiders, the Debtors indicated that there were none. Yet, Mr. Williams borrowed $1,700.00 from his mother on July 20, 2007 and paid his mother back within one year of the Petition Date. The Debtors did not list any transfers to Capital Improvements on their Statement of Financial Affairs. According to Mr.

Williams's testimony at trial, the Debtors transferred over $100,000.00 to Capital Improvements in the year prior to the Petition Date. Copies of checks from the Debtors to Capital Improvements were admitted into evidence including checks with the following dates and amounts: (1) June 29, 2007 for $8,000.00; (2) August 7, 2007 for $30,000.00; (3) August 8, 2007 for $20,000.00; (4) September 19, 2007 for $14,000.00; and (5) October 23, 2007 for $25,000.00.

**Post-Petition Statements and Actions**

Post-petition, the Debtors have made additional false statements and continued omissions. At a hearing on December 17, 2008, Mr. Williams falsely testified to the court that he had provided an accounting to the Trustee of the use of the $100,000.00 loan from Mrs. Lorey. The evidence reflects that an accounting of the disbursements from the Lorey Loan was not in fact provided to the Trustee until January 5, 2009. At their § 341 meeting, the Debtors completed questionnaires, which they each signed under penalty of perjury, to be adopted as part of the record of the meeting. They each falsely indicated that they were involved in no lawsuits, that no one owed them any money, and that their bankruptcy schedules listed everything that they owned on the Petition Date.

After the Petition Date and before § 341 meeting the Debtors received $7,076.42 in rental income from Margaret Rudd (the "Margaret Rudd Funds"). At the § 341 meeting, the Debtors disclosed that Margaret Rudd had been their rental manager and had handled the renting of the Beach Drive Property. The Debtors did not disclose the receipt of the Margaret Rudd Funds at the § 341 meeting. The Debtors did not disclose the receipt of the Margaret Rudd Funds until a meeting on June 16, 2008, in response to a direct question by the Trustee. The

Trustee immediately requested that the Margaret Rudd Funds be remitted to him. Despite the Trustee's request, the Debtors did not send the funds to him. Rather, Mrs. Williams sent a check dated June 29, 2008 in the amount of $7,076.42 to Margaret Rudd.

**Document Production**

Due to the complexity of the Debtors's financial transactions, the Trustee requested that the Debtors produce numerous documents. The Debtors's production of requested documents was untimely and incomplete. Other requested documents were simply not produced at all.

For instance, at their § 341 meeting on May 19, 2008, the Debtors gave the Trustee copies of their 2007 income tax returns and 60-day prepetition wage statements reflecting Mr. Williams's commission-based income and rental income. The Trustee also requested that the Debtors provide a copy of their bank statements showing the balance for each bank account as of the Petition Date. By letter dated May 20, 2008, the Debtors provided copies of the bank statements for Cape Fear Account #5796 for February and March 2008. They did not provide copies of their bank statements showing the balance for each bank account on the Petition Date. By letter dated June 9, 2008, the Trustee once again requested the statements showing the Petition Date balance. The requested statements were finally produced by letter dated June 24, 2008.

The Trustee also requested books and records for Capital Improvements at the § 341 meeting. By letter dated May 20, 2008, the Debtors produced only the Articles of Organization and Annual Reports for Capital Improvements. On October 21, 2008, after the Trustee had filed the Complaint, the Debtors produced bank statements for 2007 and a selection of miscellaneous receipts and invoices.

By letter dated June 9, 2008, the Trustee requested copies of bank statements, cancelled checks, and check registers from 2005 to the Petition Date. In response, the Debtors produced the statements for Cape Fear Account #5796 and Cape Fear Account #5788 for the year 2008. The Debtors did not provide copies of any other statements until after the Trustee filed the Complaint, at which point they produced some bank statements for 2007. Also in the letter dated June 9, 2008, the Trustee requested that the Debtors furnish him with documents relating to the Lorey Loan and the disposition of the loan proceeds in the amount of $100,000.00. The Trustee reiterated that request on June 18, 2008. Also by letter dated June 9, 2008, the Trustee requested copies of any listing agreements regarding the sale of the real property since January 1, 2006. These documents were not produced.

Further facts are incorporated in the discussion below and constitute additional findings of fact.

## DISCUSSION

The Trustee objects to the Debtors's discharge under § 727(a)(2), (a)(3), (a)(4)(A), (a)(4)(D), and (a)(5). The objecting party bears the burden to prove that the discharge should be denied under § 727(a). Fed. R. Bankr. P. 4005; *Farouki v. Emirates Bank Intern., Ltd.*, 14 F.3d 244, 249 (4th Cir. 1994). The objector must meet this burden by a preponderance of the evidence. *Farouki, 14 F.3d* at 249. The burden then shifts to the debtor to offer credible evidence in response. *In re Duncan*, 562 F.3d 688, 696 (5th Cir. 2009).

**11 U.S.C. § 727(a)(3)**

Pursuant to § 727(a)(3) the court shall grant the debtor a discharge, unless -

(3) the debtor has concealed, destroyed, mutilated, falsified, or failed to

11

>     keep or preserve any recorded information, including books, documents,
>     records, and papers, from which the debtor's financial condition or
>     business transactions might be ascertained, unless such act or failure to act
>     was justified under all of the circumstances of the case;

11 U.S.C. § 727(a)(3). This section does not require that a debtor maintain perfect records. *In re French,* 499 F.3d 345, 355 (4th Cir. 2007). "A debtor is, however, obliged by the statute to preserve sufficient and adequate financial records to enable the court and the parties to reasonably ascertain an accurate picture of his financial affairs." *Id.* Intent is not an element of a claim under this subsection. Once the Trustee demonstrates that the debtor failed to preserve sufficient and adequate financial records, the burden shifts to the debtor to show that such failure was justified under the circumstances. *In re Young,* 346 B.R. 597, 609 (Bankr. E.D.N.Y. 2006).

In determining whether a debtor maintained sufficient records, the court may consider a variety of factors including the level of a debtor's sophistication, the complexity of the debtor's transactions, the lack of timeliness of a debtor's disclosure of records, and any other relevant circumstances. *In re French,* 499 F.3d at 355 (*citing Meridian Bank v. Alten,* 958 F.2d 1226, 1231 (3rd Cir. 1992)). *See also In re Jacobowitz,* 309 B.R. 429 (S.D.N.Y. 2004) (finding debtor who was sophisticated enough to produce income of $8,000.00 a month in the insurance industry should have been alerted to the importance of preserving records); *In re Hensley,* 381 B.R. 699 (Bankr. N.D. Ind. 2007) (denying discharge when debtor, who was a mature and experienced businessman, did not maintain adequate records from which it could be determined what happened to the substantial business assets he possessed roughly three months prepetition); *In re Hahn,* 362 B.R. 542 (Bankr. S.D. Fla. 2007) (holding that debtors's failure to keep financial records documenting their disposition of more than $150,000.00 in funds over the two-year period preceding the petition date was not justified under the circumstances, as the debtors were

sophisticated people whose only explanation for the lack of records was that they had not anticipated that they might need to file for bankruptcy); *In re Hansen*, 325 B.R. 746 (Bankr. N.D. Ill. 2005) (finding debtor did not justify the inadequacy of his financial records given that although he claimed that monthly bank statements were ruined in basement floods, the debtor conceded that he could have secured duplicate statements but decided not to). A lack of records may be justified if a debtor's records were lost due to circumstances beyond the debtor's control.[5] *See In re Young,* 346 B.R. at 614 (finding domestic abuse experienced by the debtor justified not preserving adequate records).

The Debtors in this case did not preserve sufficient and adequate financial records to enable the Trustee to reasonably ascertain an accurate picture of their financial affairs. Prepetition, the Debtors were in the business of buying and selling real estate. They listed almost $4,000,000.00 in real property, and they had amassed in excess of $3,800,000.00 in secured debt, comprised of over 20 separate claims, and over $1,300,000.00 in unsecured claims. The Debtors's financial dealings were complex and sophisticated. Documentation was necessary for the Trustee to gain an accurate understanding of the Debtors's financial picture. The Trustee requested the books and records for Capital Improvements at the § 341 meeting and never received documentation sufficient to ascertain the value, if any, of that entity. The incomplete financial documentation that the Debtors did provide to the Trustee was produced in an untimely manner. Following his standard practice, at the § 341 meeting on May 19, 2008, the Trustee

---

[5] The court notes that the Debtors's home was struck by lightening during a storm in October 2006, resulting in water and electrical damage. The Trustee does not dispute that, as a result, the Debtors's records, both paper and electronic, dating prior to and through October 2006 were destroyed. The court finds that the absence of records dating prior to October 2006 is justified and is not a basis for the denial of the discharge under § 727(a)(3).

requested that the Debtors provide a copy of bank statements showing the balance for each of their bank accounts as of the Petition Date. These statements were not completely produced until June 24, 2008, subsequent to multiple requests by the Trustee. In addition, the Trustee requested that the Debtors furnish him with documents relating the disposition of the Lorey Loan proceeds in the amount of $100,000.00. These documents were not produced until after the Complaint was filed. With the limited records that were made available, the Trustee could not accurately ascertain the financial condition of the Debtors or of Capital Improvements, nor could he trace the disposition of over $100,000.00 that the Debtors received less than six months prior to the Petition Date.

The Debtors's failure to provide sufficient financial documentation to the Trustee is not justified under the circumstances. The court finds that the Debtors's explanation regarding their lack of financial records inadequate. Mr. Williams's testified that his attention deficit disorder prevented him from maintaining financial records, yet Mr. Williams has maintained his position as a mortgage broker for Wells Fargo for more than 10 years. Mrs. Williams testified that Mr. Williams was extremely disorganized, could not keep track of financial papers, was easily distracted, and had to shake his leg in order to not become distracted while driving, yet she relies on him entirely for all financial matters and information. Mrs. Williams has offered no explanation as to why she was unable to organize and preserve the family's financial records. She was clearly aware of the disarray. Even assuming Mr. Williams's condition rendered it difficult for him to preserve financial records in general, the Debtors obtained the Lorey Loan proceeds on December 21, 2007, less than six month prior to the Petition Date and during the same month that Mr. Williams consulted with bankruptcy counsel. It is not credible that Mr.

Williams, a mortgage broker, and Mrs. Williams, a college graduate, would not understand the importance of maintaining those financial records relating to the Lorey Loan at a time when they were contemplating filing a bankruptcy petition. Their failure to do so is simply not justified. As to the Debtors's bank statements reflecting account balances on the Petition Date, Mr. Williams testified that he could access the last 90 days of his bank account records online. As the Petition Date was April 3, 2008 and these statements were requested May 21, 2008, if the Debtors could not locate the paper statements, their failure to promptly provide a printout of this information is inexcusable.

The court finds that the Trustee has carried his burden and shown that the Debtors concealed, destroyed, and/or failed to preserve any recorded information from which their financial condition and business transactions might be ascertained, and the Debtors's actions and failure to act was not justified under the circumstances. Therefore, the Debtors's discharge shall be denied pursuant to § 727(a)(3).

**11 U.S.C. § 727(a)(4)(A)**

Section 727(a)(4)(A) of the Bankruptcy Code provides that the court shall grant the debtor a discharge under Chapter 7, unless the debtor knowingly and fraudulently, in or in connection with the case made a false oath or account. 11. U.S.C. § 727(a)(4)(A). The purpose of § 727(a)(4)(A) is to ensure that a debtor provides complete and accurate information to the bankruptcy court and those with an interest in the administration of the debtor's estate. *In re Slattery*, 333 B.R. 340, 344 (Bankr. D. Md. 2005). *See also In re Pratt*, 411 F.3d 561, 566 (5th Cir. 2005) (stating that full disclosure is essential, "because the schedules 'serve the important purpose of insuring that adequate information is available for the Trustee and creditors without

15

need for investigation to determine whether the information provided is true.'"). The elements of § 727(a)(4)(A), are as follows: (1) the debtor made a statement under oath; (2) the statement was false; (3) the debtor knew the statement was false; (4) the debtor made the statement with fraudulent intent; and (5) the statement related materially to the bankruptcy case. *In re Keeney*, 227 F.3d 679, 685 (6th Cir. 2000); *In re Reader*, 399 B.R. 432, 441-42 (Bankr. N.D. W.Va. 2009).

  The Debtors do not contest that their petition, schedules, and statement of financial affairs contain false statements. They contend, however, that Mrs. Williams did not have knowledge of their financial matters. While Mrs. Williams did testify that she relied on Mr. Williams regarding all financial matters, it is clear from the evidence presented that she did have knowledge that certain statements on the bankruptcy schedules were false. For example, several life insurance policies were not disclosed on the Debtors's schedules. Mrs. Williams admitted that she had discussed life insurance policies with Mr. Williams on more than one occasion prepetition and that the life insurance was very important to her. Mrs. Williams also had knowledge that transfers were made to Capital Improvements within a year of the Petition Date as she actually wrote some of the checks to Capital Improvements. No such transfers were disclosed on the Statement of Financial Affairs. Mrs. Williams was aware that her husband had a joint account with his mother. This account was not listed as either a current account or as a closed financial account. Mrs. Williams also clearly had knowledge at the time of their § 341 meeting that she was involved in at least one lawsuit, yet she completed a questionnaire for the Trustee, signed under penalty of perjury, falsely indicating that she was involved in no lawsuits. In fact, Mrs. Williams's memory at trial appeared to be quite selective. At times during the trial

she could not answer the most general questions, simply indicating that she could not remember or did not know because she relied entirely on Mr. Williams. At other times, she could recall or had knowledge of very specific financial details, such as the amount of her mother-in-law's mortgage payment two years ago or whether Mr. Williams deposited any of his owns funds into the joint account with his mother. As a result, the court cannot find that Mrs. Williams's testimony regarding what she did and did not know is entirely credible.

The Debtors contend that, despite the fact that they made materially false statements under oath, neither Mr. Williams nor Mrs. Williams acted with the fraudulent intent required for the denial of a discharge under § 727(a)(4)(A). Fraudulent intent may be established by circumstantial evidence or inferred from a course of conduct. *Williamson v. Fireman's Fund Ins. Co.*, 828 F.2d 249, 252 (4th Cir. 1987); *In re Slattery*, 333 B.R. 340, 345 (Bankr. D. Md. 2005). A reckless disregard for the truth may be evidence of fraudulent intent. *In re Hatton*, 204 B.R. 477, 484 (E.D. Va. 1997). While an inadvertent mistake is not cause for the denial of a discharge, a pattern of omissions and inaccuracies on a debtor's sworn schedules indicates a reckless disregard for the truth. *In re Slattery,* 333 B.R. at 346 (omissions of real property on schedules evidences at minimum a reckless disregard for the truth equivalent to fraud); *In re Hooper,* 274 B.R. 210, 219 (Bankr. D. S.C. 2001) (finding that numerous inaccuracies on schedules and statement of financial affairs displayed a reckless disregard for the truth); *In re Hatton*, 204 B.R. at 484 (holding that the failure to list on petition various insider transactions and expenditures constituted a pattern of concealment and nondisclosure from which fraudulent intent could be inferred). Certainly, a debtor's honest confusion or lack of understanding may weigh against an inference of fraudulent intent. *In re Hatton*, 204 B.R. at 484. A debtor's

prompt efforts to amend any misstatements may also weigh against a finding of fraudulent intent; however, the failure to amend may weigh in favor of fraudulent intent. *In re Oliver*, 414 B.R. 361, 374-75 (Bankr. E.D. Tenn. 2009) ("a debtor who mistakenly or inadvertently provides false information or fails to disclose pertinent information and takes steps to amend his schedules to correct them prior to or during a meeting of creditors is not generally thought to possess the requisite fraudulent intent to deny discharge under § 727(a)(4)(A)"); *In re Cole*, 378 B.R. 215, 222 (Bankr. N.D. Ill. 2007) (finding that debtor acted with reckless indifference to the truth in not offering an explanation for misstatement and not amending schedules).

After considering the facts and circumstances of this case, including the credibility and demeanor of the witnesses, the court finds that the Trustee has met his burden of showing that the Debtors acted with the requisite fraudulent intent to be denied a discharge under 727(a)(4)(A). Both the Debtors's course of conduct and reckless indifference towards the truth support such a finding. The Debtors's petition and schedules included significant and material misstatements regarding their income and assets. Mr. Williams offered no credible explanation as to why over $24,000.00 in income was omitted from the schedules. As a mortgage broker, he is well versed in what constitutes income, and he had highly competent counsel to assist him with any questions he might have had. Similarly, Mr. Williams offered no credible explanation for understating the Petition Date balance of the Cape Fear Account #5796 by over $13,000.00. Simply the fact that the Debtors initially provided bank statements for only February and March, but omitted the April statement which reflected the Petition Date balance, certainly gives the court pause, particularly when the court does not doubt that Debtors's counsel advised the Debtors that this documentation was requested in all cases. Putting that aside, however, Mr.

Williams's testimony on this issue was inconsistent and unclear. At one point, Mr. Williams indicated that he calculated the amount he listed in Cape Fear Account #5796 by checking the balance online and deducting outstanding checks as well as checks he anticipated writing. Mr. Williams then indicated that he did not actually write certain checks that he thought he was going to write. At another point, Mr. Williams indicated that he calculated the amount in Cape Fear Account #5796 by taking the balance from the March statement and subtracting subsequent expenditures. After examining the actual bank statement for any checks that cleared shortly after the Petition Date, as well as considering the Debtors's regular monthly expenses, the court can conceive of no scenario under which Mr. Williams could have logically calculated the bank balance as he did.

    Mrs. Williams's conduct and demeanor also evidence a reckless disregard for the truth. During the trial, Mrs. Williams seemed almost flippant regarding the numerous false statements on documents that she signed under penalty of perjury, and disdainful of the Trustee's requests for information and documentation. Mrs. Williams testified that she could not be employed outside the home because she needed to be available to deal with the bankruptcy proceeding, yet her actions belie this statement and reflect poorly on her intent. By her own testimony, she was available, full-time, to deal with any requests made by the Trustee, yet the Trustee had to repeatedly request documents and responses were slow and incomplete. Mrs. Williams indicated that documents were strewn about the house, and that her husband was disorganized as a result of his attention deficit disorder. Yet, even after November of 2007 when she became aware of the need to file bankruptcy, Mrs. Williams apparently did nothing to organize or retain financial records, such as documents relating to the Lorey Loan proceeds received in December of that

year. Additionally, after the Petition Date and before the § 341 meeting, the Debtors received the $7,076.42 in Margaret Rudd Funds. The Debtors did not disclose the receipt of the Margaret Rudd Funds at the § 341 meeting, even when the subject of the Margaret Rudd contract was discussed. When the Trustee finally learned of the Margaret Rudd Funds on June 16, 2008, rather than remitting the funds to the Trustee, Mrs. Williams wrote a check remitting the funds back to Margaret Rudd, thereby creating unnecessary work and inconvenience for the Trustee.

The court notes that the Debtors did ultimately file schedules amending some of the false statements, however as these amendments were not filed until August and only addressed a few of the inaccuracies, this one small gesture does not cure their overwhelming disregard of accuracy and the truth, particularly in light of the Debtors's general lack of cooperation. Consequently, the distinct pattern of nondisclosure and false statements evidences a reckless indifference for the truth that supports a finding of fraudulent intent.

Based upon the foregoing, the court concludes that, pursuant to § 727(a)(4)(A), the Debtors's discharge must denied.

## CONCLUSION

As the court has found that the Trustee has met his burden under both § 727(a)(3) and § 727(a)(4)(A), the court will not address the Trustee's remaining claims. The court shall enter a separate judgment consistent with this memorandum opinion denying the Debtors's discharge.

"End of Document"